IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

H., et al.                    :    CIVIL ACTION
                              :
        v.                    :
                              :
EASTON AREA SCHOOL DISTRICT   :    NO. 10-6283


MEMORANDUM

McLaughlin, J.                                April 12, 2011


        This case involves a middle school's ban on breast
cancer awareness bracelets that bear the slogan "I ♥ Boobies!
(Keep A Breast)" and similar statements.  These bracelets are
distributed by the Keep A Breast Foundation, which operates
breast cancer education programs and campaigns that are oriented
toward young women.  On the school's designated breast cancer
awareness day, two female students defied the school's bracelet
prohibition and both were suspended for a day and a half and
prohibited from attending an upcoming school dance.  The
students, by and through their parents, filed this law suit
seeking, among other things, a preliminary injunction to enjoin
the school district from enforcing the ban.

        The plaintiffs argue that the school has violated their
First Amendment right to freedom of speech.  The two Supreme
Court cases examining student speech that are most relevant to
this case are Fraser and Tinker.  See Bethel Sch. Dist. v.
Fraser, 478 U.S. 675 (1986); Tinker v. Des Moines Indep. Cmty.

Sch. Dist., 393 U.S. 503 (1969).  Fraser allows schools to ban speech that is lewd or vulgar.  If the speech does not meet the standard of Fraser, Tinker applies.  Tinker forbids the suppression of student expression unless that expression is reasonably foreseen as a material and substantial disruption of the work and discipline of the school.  The school district contends that the bracelets are lewd and vulgar under Fraser and if not, that they caused a substantial disruption of school operations under Tinker or the School District had a reasonable expectation of such disruption.

The Court concludes that these bracelets cannot reasonably be considered lewd or vulgar under the standard of Fraser.  The bracelets are intended to be and they can reasonably be viewed as speech designed to raise awareness of breast cancer and to reduce stigma associated with openly discussing breast health.  Nor has the school district presented evidence of a well-founded expectation of material and substantial disruption from wearing these bracelets under Tinker.  The Court will therefore grant the plaintiffs' motion for preliminary injunction.

I.  Procedural History

On November 15, 2010, the plaintiffs filed this law suit and a motion for a temporary restraining order and

preliminary injunction.  The plaintiffs' motion sought a temporary restraining order allowing the plaintiffs to attend the upcoming "Snow Ball" middle school dance, which the school had prohibited the plaintiffs from attending as punishment for wearing their breast cancer awareness bracelets, along with one and a half days of in-school suspension.

The Court held a telephone conference with counsel for the parties and urged the school to allow the students to attend the school dance with the option of imposing comparable punishment if the Court held that the ban was constitutional. The school agreed to the Court's proposal.  The Court then denied the motion for a temporary restraining order without prejudice.

On December 16, 2010, the Court held a day-long evidentiary hearing.  At the hearing, the Court heard testimony from the two minor plaintiffs, B.H. and K.M.; Kimberly McAtee, a representative from the Keep A Breast Foundation; Stephen Furst, the Director of Teaching and Learning for the Easton Area School District; Anthony Viglianti, the Seventh Grade Assistant Principal; Amy Braxmeier, the Eighth Grade Assistant Principal; and Angela DiVietro, the Head Principal of Easton Area Middle School for grades seven and eight.  On February 18, 2011, the Court held oral argument on the plaintiffs' motion.

II.  <u>Findings of Fact</u>

        This case involves two students, B.H. and K.M., who are
currently enrolled in the Easton Area Middle School.  B.H. is a
thirteen-year-old, eighth grade student at Easton Area Middle
School.  K.M. is a twelve-year-old, seventh grade student at
Easton Area Middle School.  The defendant Easton Area School
District (the "School District") is a political subdivision of
the Commonwealth of Pennsylvania.  (Notes of Testimony,
Evidentiary Hearing, Dec. 16, 2010 ("N.T.") at 22:4-5;[1] Compl.
¶¶ 6-7; Answer ¶¶ 6-7.)

        Easton Area Middle School (the "Middle School") is a
large complex that holds two separate schools: a fifth and sixth
grade school and a seventh and eighth grade school.  The fifth
and sixth grade school has a separate entrance, separate
classrooms, separate lunchrooms, and is administered separately
from the 7-8 building.  The plaintiffs attend classes in the
Middle School's 7-8 building.  (N.T. 153:2-154:5.)

        The bracelets at issue in this case include several
colored rubber bracelets that contain various slogans including
"I ♥ boobies! (KEEP A BREAST)", "check y♥ur self!! (KEEP A

---

[1]        The page citations are to the page numbers in the paper
version of the hearing transcript.  The page numbering of the
electronic version differs by one.

4

BREAST)", and a bracelet with an amalgam of similar slogans.[2]

The web address for the Keep A Breast Foundation,

keep-a-breast.org, is contained on the inside of all of the

bracelets. (See Pls.' Ex. 39, 40.)


   A.   Keep A Breast Foundation

       The Keep A Breast Foundation (the "Foundation"), a

501(c)(3) nonprofit organization, distributes these bracelets.

The Keep A Breast Foundation operates breast cancer education

programs and campaigns that are oriented towards young women.

The "I ♥ Boobies! (Keep A Breast)" bracelets serve as an

---

       [2]    Pictures of these bracelets may be found online. See,
e.g., The Keep A Breast Foundation, Zumiez!!,
http://www.keep-a-breast.org/blog/zumiez/ (last visited Feb. 22,
2011). The bracelet with the amalgam of slogans is co-branded
with the clothing line "Glamour Kills." The bracelet includes
the slogans "♥ boobies!", "KAB", "Glamour Kills", and "KEEP A
BREAST." The co-branded bracelet also includes the web address
glamourkills.com on the inside of the bracelet. In exchange for
a donation, the Keep A Breast Foundation allows other businesses
to market their products using the Keep A Breast name and
slogans, including "I ♥ Boobies!". (N.T. 110:12-113:4.) This
is termed "co-branding" or "cause marketing." In addition to
Glamour Kills, the Keep A Breast Foundation co-brands with the
following businesses: Kleen Canteen, Etnies shoes, and SJC Snare
Drum brand apparel. (K. McAtee Dep. 43:24-47:10; Transcript of
oral argument, Feb. 18, 2011, ("Tr.") at 19:19-21:11.) The
School District argues that these bracelets are commercial speech
and are therefore afforded less constitutional protection. The
presence of co-branding on one of the several bracelets at issue
here, however, does not transform these bracelets into commercial
speech. The bracelets are not the type of speech that "does no
more than propose a commercial transaction." See Bolger v.
Youngs Drug Prods. Corp., 463 U.S. 60, 66-68 (1983) (citation
omitted).

awareness and fund-raising tool for the Foundation.  The
Foundation targets its awareness efforts to young women under 30.
One of the goals of the Foundation is to educate young women
about breast cancer and to help young women discuss breast health
openly with their doctors.  The Foundation encourages young women
to establish a baseline knowledge of how their breasts feel in
order to improve their ability to detect changes in their
breasts.  Breast cancer prevention and health information is
available by clicking on the health page of the Foundation's
website.  (N.T. 105:21-24, 120:19-121:2, 121:3-6.)

The Keep A Breast Foundation believes that a barrier to
achieving their goals is negative body images among young women.
Young women may feel that a stigma is associated with touching,
looking at, or talking about their breasts.  The Foundation's "I
♥ Boobies!" campaign seeks to reduce this stigma and to help
women talk openly and without embarrassment about their breasts.
The bracelets are intended to be and may be reasonably viewed as
conversation starters to facilitate discussion of breast cancer,
and to help overcome fear and taboo associated with discussing
breast health.[3]  (N.T. 98:9-20.)

---

[3]    There was evidence that a teacher at the Middle School
felt that these bracelets offer "cutesy" or insufficiently
serious treatment of breast cancer awareness.  The Court takes no
view as to whether these bracelets are an effective breast cancer
awareness tool or whether the bracelets may be viewed as making
light of a very serious disease.  The Court finds, however, that
the bracelets are intended to be, and may be reasonably viewed

The Foundation controls the distribution of the bracelets to ensure that the purchaser will have access to the Keep A Breast Foundation's educational materials.  Truck stops, convenience stores, vending machine companies, and even "porn stars" have expressed interest in selling or being associated with the bracelets and the Foundation, but the Keep A Breast Foundation has rejected these requests.  (N.T. 101:18-102:13.)

B.    The Plaintiffs' Purchase of the Bracelets

The plaintiffs purchased their "I ♥ Boobies! (Keep A Breast)" bracelets with their mothers prior to the start of the 2010-11 school year.  B.H. learned about the bracelets and their purpose from her friends.  B.H. and her mother Jennifer Hawk sought out the bracelets together, making multiple attempts to find them in stores.  After purchasing the bracelets, B.H. wore them every day, up until her suspension.  By purchasing and wearing the bracelets, B.H. wanted to show her support for breast cancer prevention, raise awareness and initiate dialogue about breast cancer, and support the Keep A Breast Foundation's breast cancer prevention programs.  B.H. also wanted to honor a close friend of the family who survived the disease after undergoing a

---

as, speech designed to raise awareness of breast cancer and reduce stigma associated with openly discussing breast health.

double mastectomy.  (N.T. 22:6-21, 56:12-15, 22:13-15, 22:15-21,
23:4-17, 26:1-5, 27:20-22, 23:18-24:23, 24:1-20, 43:1-10.)

K.M. first learned about the "I ♥ Boobies! (Keep A
Breast)" bracelets over the summer of 2010 from her friend B.H.
Before the school year started, K.M. and her mother Amy McDonald-
Martinez traveled together to the mall to purchase "I ♥ Boobies!
(Keep A Breast)" bracelets.  After purchasing the bracelets, K.M.
wore them every day, up until her suspension.  K.M.'s mother, Amy
McDonald-Martinez, also wore a Keep a Breast Foundation bracelet
that contained the phrase "check y♥ur self!! (Keep A Breast)."
(N.T. 55:25-56:8, 56:14-57:9, 59:5-24, Pls.' Ex. 41.)

Both young women researched and learned more about
breast cancer after purchasing these bracelets.  B.H. learned
about the Keep A Breast Foundation through in-store displays and
the Foundation's website.  After purchasing the bracelets, K.M.
sought out more information about breast cancer, and learned that
the youngest girl diagnosed with breast cancer was ten years old.
She also learned about breast cancer risk factors, the effects of
breast cancer, and how to check one's self for lumps.  She
learned about her great aunt who had breast cancer and that
breast cancer "can run in the family."  Both B.H. and K.M.
believe that the bracelets more effectively raise awareness for
breast cancer than the color pink.  B.H. explained that "no one
really notices [the color pink]."  (N.T. 42:12-25, 60:11-23,

74:3-10, 56:25-58:12, 91:22-92:6, 24:12-23, 64:24-66:4, 24:12-23.)

C.   <u>The School's Bracelet Ban</u>

The "I ♥ Boobies! (Keep A Breast)" bracelets became popular with students at the Easton Area Middle School during the beginning of the 2010-2011 school year, which began on August 30, 2010.  In mid- to late-September, approximately four or five of the 120 teachers in the Middle School's 7-8 building spoke to or electronically contacted Ms. Braxmeier about the "I ♥ Boobies! (Keep A Breast)" bracelets.  The teachers sought instruction regarding how the school would choose to handle the bracelets. The three principals, Mr. Viglianti, Ms. Braxmeier, and Ms. DiVietro, conferred and agreed that the bracelets should be banned.  (N.T. 190:10-16, 210:16-211:5.)

On September 23, 2010, Mr. Viglianti sent an email instructing faculty and staff to ask students to remove "wristbands that have the word 'boobie' written on them."  Mr. Viglianti stated that students instead may wear pink on October 28th in honor of Breast Cancer Awareness Month.  This initial ban was not communicated directly to the students.  On October 27, 2010, a day before the School District's designated breast cancer awareness day, Ms. DiVietro recirculated the email that Mr. Viglianti sent on September 23, 2010.  In response, a teacher

9

requested that the ban be communicated to the students directly by the administration.[4]  On the afternoon of October 27, 2010, approximately two months into the school year, Mr. Viglianti read a prepared statement over the public address system describing the ban.  The next morning, October 28, 2010, a student delivered a statement prepared by the School administration on the School's TV station that reiterated the ban.  The School's TV announcement contained the word "boobies."  (Pls.' Ex. 1.; Pls.' Ex. 2.; N.T. 64:3-5.)

At the time that the ban initially went into effect, September 23, 2010, none of the three principals had heard any reports of disruption or student misbehavior linked to the bracelets.  Nor had any of the principals heard reports of inappropriate comments about "boobies."  The three principals offered various reasons for their decision to ban the bracelets.

Mr. Viglianti testified at his deposition that the administrators' decision was based on the term "boobies," which was "not appropriate."  He thought that some of the students were not mature enough "to understand and see that [as] appropriate",

_____

[4]     The email stated, "Can this please be announced either via the morning TV announcements or by someone in the main office?  We were issued a similar email in the past but the students have not been told by administration that these bracelets are a violation of dress code and if they wear them they will be written up for defiance. . . . We need a direct statement from administration."  Email from Carrie A. Sanal to Angela DiVietro, October 27, 2010 (Pls.' Ex. 3).

and he was concerned that the use of the word "boobies" in the bracelets would cause students "to start using the word just in communication with other students, talking with other students." He testified at the evidentiary hearing that the word "boobies" was "vulgar," based on his understanding that "vulgar is slang." At his deposition, Mr. Viglianti also testified that it would be similarly inappropriate for either the word "breast" or the phrases "keep-a-breast.org" or "breast cancer awareness" to be displayed on clothing in the middle school. During the evidentiary hearing, he changed his position and concluded that a bracelet bearing only "keep-a-breast.org" would be permissible. (Viglianti Dep. 50:1-10, 18:3-19:1, 20:12-23, 24:14-21; N.T. 128:16-19, 124:18-125:21.)

Ms. DiVietro also clarified her position at the evidentiary hearing. At her deposition, Ms. DiVietro testified that the words "keep-a-breast.org" are "not acceptable" for middle schoolers because the word "breast" "can be construed as a sexual connotation." At the evidentiary hearing, she concluded that the words "breast cancer awareness" or a bracelet that only said "keep-a-breast.org" would not be vulgar in a middle school. (DiVietro Dep. 23:4-25, 51:24-52:2; N.T. 229:3-230:23, 242:18-243:3.)

At the evidentiary hearing, the School's principals testified that the bracelets violate the Middle School's dress

code because the phrase "I ♥ Boobies!" is an impermissible double entendre about sexual attraction to breasts. (N.T. 179:18-22, 211:16-22.)

Ms. DiVietro testified that allowing students to wear the Keep A Breast Foundation's "I ♥ Boobies! (Keep A Breast)" bracelets would diminish her authority to prevent students from wearing clothing with other statements that the administrators deemed "inappropriate." She explained that banning the "I ♥ Boobies! (Keep A Breast)" bracelets "makes a statement that we as a school district have the right to have discretionary decisions on what types of things are appropriate and inappropriate for our school children." (N.T. 211:23-212:1, 224:14-226:19, 228:5-10.)[5]

On October 27, 2010, B.H. wore her bracelets to school. During lunch, a cafeteria monitor noticed her bracelets and summoned the security guard, John Border.[6] B.H. admitted to Mr.

---

[5]    The justification for the ban as explained by the three administrators during their testimony differs from the justification first articulated by the School District in its November 9, 2010 letter to the plaintiffs' counsel. In that letter, the School District claimed that it banned the bracelets because some Middle School students are uncomfortable with discussion of the human body; some male Middle School students had made "embarrassing" comments to female students about their breasts; the students who defied the ban were then observed "high-fiving" each other in the cafeteria; and some Middle School teachers believe that the bracelets trivialize the subject of breast cancer and they are personally offended by the bracelets' "cutesy" treatment of the disease. (Compl. ¶ 29; Answer ¶ 29.)

[6]    Prior to taking the position of security for the District, John Border was a police officer for the Easton Police Department. He also served as Chief of the Easton Police

Border that she was wearing the bracelets but refused to remove them, so Mr. Border escorted her to Ms. Braxmeier's office. After speaking with Ms. Braxmeier, B.H. agreed to remove the bracelets, and was then allowed to return to the cafeteria without punishment.  The bracelets had not caused any disruption in the cafeteria.  (N.T. 175:2-8 (Border testifying).)

Later that day after school, October 27, 2010, B.H. told her mother that the "I ♥ Boobies! (Keep A Breast)" bracelets had been banned and asked permission to wear her bracelets despite the ban.  Her mother agreed.  K.M. also told her mother of the ban on the "I ♥ Boobies! (Keep A Breast)" bracelets.  K.M. was also given permission by her mother to wear her bracelets on the following day, the School's Breast Cancer Awareness Day.  (N.T. 31:11-32:6; J. Hawk Dep. 8:2-9; N.T. 66:5-15; A. McDonald-Martinez Dep. 21:3-22:14.)

On October 28, 2010, the School District observed Breast Cancer Awareness Day.  For the district-wide Breast Cancer Awareness Day, faculty and students were encouraged to wear pink to demonstrate support for breast cancer awareness.  On October 28, 2010, Mr. Border was again notified that B.H. was wearing the "I ♥ Boobies! (Keep A Breast)" bracelets during lunch period in defiance of the ban.  Mr. Border approached B.H. and asked her to remove the bracelet.  B.H. informed Mr. Border that she would not

---

Department for five years.  (N.T. 168:16-169:2.)

remove her bracelet.  At that time, K.M. stated that she was wearing an "I ♥ Boobies! (Keep A Breast)" bracelet and was also not going to take it off.  (N.T. 158:12-19; 218:25-219:19, 75:25-76:22; 172:9-174:18).

After B.H. and K.M stated that they would not remove their bracelets, a third girl, R.T., stood up and said that she also had a bracelet on and was not going to take it off.  Mr. Border allowed the girls to finish eating their lunches, then escorted them to Ms. Braxmeier's office.  On their way to Ms. Braxmeier's office, B.H. and K.M. gave each other a "low-five" because they were proud of themselves for standing up for what they believe in.  This did not create a disruption and Mr. Border testified that he did not notice it.  (N.T. 33:15-21; 45:10-17; 174:6-10.)

Ms. Braxmeier first spoke with R.T.  R.T. agreed to remove her bracelet.  In the course of her discussion with Ms. Braxmeier, R.T. explained that she understood why students were not allowed to wear the "I ♥ Boobies! (Keep A Breast)" bracelets.  Specifically, R.T. stated that some boys or some boy was "immature" and had been approaching girls and commenting "I love your boobies" or "I love boobies."  When the School elicited a written statement from R.T. on November 15, 2010 (after receiving the plaintiffs' November 4, 2010 demand letter), R.T. equivocated as to whether the incident involved multiple boys or

14

just one boy, and stated that she did not know the student's name.  (N.T. 185:2-5; A. Braxmeier Dep. 20:23-21:1, 26:25-27:4, 67:13-16; Def.'s Ex. 14 (R.T.'s written statement), N.T. 194:18-20.)

Ms. Braxmeier then spoke with K.M individually.  K.M. stated that she was unwilling to remove her bracelets.  After discussing the bracelets with K.M., Ms. Braxmeier spoke with B.H. individually about her "I ♥ Boobies! (Keep A Breast)" bracelets. B.H. explained to Ms. Braxmeier that the bracelet was "for breast cancer and people in [her] family have been affected by breast cancer" and she felt that it was her freedom of speech to wear the bracelets.  Ms. Braxmeier then conferred with Mr. Viglianti and Ms. DiVietro, and they agreed that B.H. and K.M. would be punished with an in-school suspension for the remainder of that day and for all of the following day and could not attend the upcoming "Winter Ball" school dance.  (N.T. 185:6-187:16; 187:18-24; 37:1-7.)

The Court was presented with evidence of two incidents in late October and mid-November where the school administrators received reports of boys making inappropriate remarks about "boobies" in reference to the "I ♥ Boobies! (Keep A Breast)" bracelets.  First, during Ms. Braxmeier's October 28, 2010 conversation with R.T. about her "I ♥ Boobies! (Keep A Breast)" bracelets, R.T. stated that she believed some boy(s) had made

remarks to girls about their "boobies."  The specific details surrounding this incident were never confirmed.  Second, on or about November 16, 2010, the Middle School administrators received a report that two female students were discussing the "I ♥ Boobies! (Keep A Breast)" bracelets when a boy sitting with them at lunch interrupted them and made statements such as "I want boobies" and made inappropriate gestures with two fireball candies.  The administrators spoke with the boy, who admitted to the incident and was suspended for one day.  (Braxmeier Dep. 14:24-15:3, 16:9-17:5.)

There were also two unrelated incidents of inappropriate touching by middle school boys of eighth grade girls in October.  There is no evidence that either incident was caused by the plaintiffs' "I ♥ Boobies! (Keep A Breast)" bracelets.  (Braxmeier Dep. 22:19-23:9; Def.'s Ex. 11; N.T. 143:1-18.)

III. Analysis

The plaintiffs have filed a motion for a preliminary injunction to enjoin the Middle School from enforcing its ban of the "I ♥ Boobies! (Keep A Breast)" bracelets.  A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will

not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  See also ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc).

     A.    Likelihood of Success on the Merits

     The plaintiffs claim that the School's ban on the "I ♥ Boobies! (Keep A Breast)" bracelets violates their First Amendment right to freedom of speech.  There are four Supreme Court cases analyzing the First Amendment free speech rights of students in public schools: (1) Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); (2) Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (1986); (3) Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988); and (4) Morse v. Frederick, 551 U.S. 393 (2007).[7]

     In Tinker, several students were suspended from school for wearing black arm bands to protest the Vietnam War.  The Supreme Court noted that the wearing of armbands was "closely akin to 'pure speech'" which the Court has held is entitled to comprehensive protection under the First Amendment.  Tinker, 393 U.S. at 505 (citation omitted).  The Court first observed that

---

    [7]    Only Tinker and Fraser are directly relevant here, but the Court will discuss all four cases for completeness.

"[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id. at 506. But the Court also recognized the authority of school officials to control conduct in schools "consistent with fundamental constitutional safeguards[.]" Id. at 507. In balancing these competing interests, the Court focused on whether the speech "intrudes upon the work of the schools or the rights of other students." Id. at 508. The Supreme Court held that student expression may not be suppressed unless school officials reasonably forecast that it will "materially and substantially disrupt the work and discipline of the school." Id. at 513-14.

In Bethel v. Fraser, Matthew Fraser delivered a speech before a high school assembly to nominate a fellow student for student elective office. Fraser's speech employed what the Court described as "an elaborate, graphic, and explicit sexual metaphor." Fraser, 478 U.S. at 678. The Court held that schools may prohibit speech that is lewd, vulgar, indecent, or plainly offensive even in the absence of a substantial disruption under Tinker. Id. at 684-86; Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 213-14 (3d Cir. 2001) (Alito, J.).

In Hazelwood School District v. Kuhlmeier, the Supreme Court addressed the publication of a school-sponsored high school newspaper that contained articles addressing students' experience

18

with pregnancy and the impact of divorce on students at the school. <u>Kuhlmeier</u>, 484 U.S. at 263. The Court held that the school could exercise editorial control over school-sponsored speech provided that the school's actions are "reasonably related to legitimate pedagogical concerns." <u>Id.</u> at 273.

Most recently, <u>Morse v. Frederick</u> addressed speech that advocates illegal drug use. In <u>Morse</u>, a student unfurled a banner that contained the phrase "Bong Hits 4 Jesus" at a school-sanctioned and school-supervised event. <u>Morse</u>, 551 U.S. at 396-97. The Supreme Court held that schools may prohibit speech that can "reasonably be regarded as encouraging illegal drug use." <u>Id.</u> at 397.

In summary, a school may categorically prohibit speech that is (1) lewd, vulgar, or profane; (2) school-sponsored speech on the basis of a legitimate pedagogical concern; and (3) speech that advocates illegal drug use. If school speech does not fit within one of these exceptions, it may be prohibited only if it would substantially disrupt school operations. <u>See</u> <u>Saxe</u>, 240 F.3d at 214.

The plaintiffs argue that <u>Tinker</u> applies and that the School acted impermissibly because the School had no reasonable expectation of a substantial disruption of school operations. The defendant argues that the standard of <u>Fraser</u> is met and the School acted within its discretion to ban lewd and vulgar speech.

Alternatively, the School District argues that the bracelets may be banned because there was a reasonable expectation that they would cause or did cause a substantial disruption to the School.

In deciding whether the plaintiffs are likely to succeed on the merits, the Court first discusses the substantive standard of <u>Fraser</u>, and then addresses the standard of review of a school district's determination that certain conduct fits within the <u>Fraser</u> standard. The Court then applies that legal framework to the facts of this case. Finding that the <u>Fraser</u> standard is not met, the Court then examines whether the standard of <u>Tinker</u> is met.

1. *Fraser* Analysis

a. Substantive Standard of *Fraser*

In <u>Bethel v. Fraser</u>, Matthew Fraser delivered a speech to a school assembly that endorsed a fellow student for elective office by means of "an elaborate, graphic, and explicit sexual metaphor." <u>Fraser</u>, 478 U.S. at 678.[8] The school suspended

---

[8] The text of Fraser's speech is:

I know a man who is firm — he's firm in his pants, he's firm in his shirt, his character is firm — but most . . . of all, his belief in you, the students of Bethel, is firm. Jeff Kuhlman is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts — he drives hard, pushing and pushing until finally — he succeeds. Jeff is a man who will go to the

Fraser for three days and removed his name from the list of candidates for graduation speaker at the school's commencement exercises. The Court held that the school district "acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech." Id. at 685. The Court did not conduct a Tinker disruption analysis.

The lewd nature of Fraser's speech was apparent to all those who had heard it. During the speech, some students "hooted and yelled", others made gestures simulating the sexual allusions in the speech, while other students appeared to be "bewildered and embarrassed by the speech." Id. at 678. One teacher found it necessary to forgo a portion of the next day's scheduled class lesson to discuss the speech with the class.

The Court of Appeals for the Third Circuit interpreted Fraser in Saxe v. State College Area School District, 240 F.3d 200, 213-14 (3d Cir. 2001). In Saxe, the Court of Appeals addressed a school district's anti-harassment policy. The Court observed that "Fraser permits a school to prohibit words that 'offend for the same reasons that obscenity offends' – a

---

very end — even the climax, for each and every one of you. So vote for Jeff for A.S.B. vice-president — he'll never come between you and the best our high school can be.

Fraser, 478 U.S. at 687 (Brennan, J. concurring).

dichotomy neatly illustrated by the comparison between Cohen's jacket and Tinker's armband." Saxe, 240 F.3d at 213.[9]  After reviewing Fraser, the Court concluded that there is no First Amendment protection for "lewd," "vulgar," "indecent," and "plainly offensive" speech in school.  Id.  This standard is "relatively more permissive" than Tinker because schools may prohibit speech that falls in the category of lewd or vulgar speech even in the absence of a substantial disruption.  Id. at 214, 216.[10]

In Sypniewski v. Warren Hills Regional Board of Education, 307 F.3d 243, 255-58 (3d Cir. 2002), the Court of Appeals considered the constitutionality of prohibiting a T-shirt that contained a slang word for a female's breasts, although this word was not a primary focus for the Court and the parties agreed that the case should be analyzed under Tinker.  Thomas Sypniewski was suspended for wearing a Jeff Foxworthy T-shirt.  Id. at 246.

---

[9]     "Cohen's jacket" here refers to Paul Robert Cohen, an adult who wore a coat to the Los Angeles County Courthouse that bore the words "Fuck the Draft."  See Cohen v. California, 403 U.S. 15, 16 (1971).

[10]     The supporting cases cited by Fraser likewise all concern vulgarity, obscenity, and profanity.  See Fraser, 478 U.S. at 684-85 (citing Ginsberg v. New York, 390 U.S. 629, 639-41 (1968) (upholding ban on sale of sexually oriented material to minors); Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 871-72 (1982) (school may remove "pervasively vulgar" books from library); FCC v. Pacifica Found., 438 U.S. 726, 745-48 (1978) (upholding FCC's ability to censor "obscene, indecent, or profane" speech).

The T-shirt listed 10 reasons one might be a "redneck sports fan."[11]  The 10 reasons included references to gambling, the "Bud Bowl,"[12] and the restaurant chain "Hooters."  Id. at 249–50.  The Court of Appeals noted that the defendants did not contend that the Foxworthy shirt contained "indecent language," nor was the shirt school-sponsored.  Id. at 254.  Accordingly, under Saxe, the Court of Appeals analyzed the T-shirt under Tinker's general rule of substantial disruption.  Id.  The Court concluded that the school could not prohibit the T-shirt under Tinker despite a history of racial incidents in the school district.  Id. at 258.

In Morse, the Supreme Court distilled from Fraser two basic principles.  First, constitutional rights of students are not automatically coextensive with the rights of adults in other

_____

[11]    The T-shirt contained the following 10 reasons one may be a "redneck sports fan."

10. You've ever been shirtless at a freezing football game.
9. Your carpet used to be part of a football field.
8. Your basketball hoop used to be a fishing net.
7. There's a roll of duct tape in your golf bag.
6. You know the Hooter's [sic] menu by heart.
5. Your mama is banned from the front row at wrestling matches.
4. Your bowling team has it's [sic] own fight song.
3. You think the "Bud Bowl" is real.
2. You wear a baseball cap to bed.
1. You've ever told your bookie "I was just kidding."

Sypniewski, 307 F.3d at 249–50.

[12]    "The Bud Bowl is a fictional football game between bottles of beer used in a beer advertising campaign." Sypniewski, 307 F.3d at 251 n.7.

settings.  If the speech had been delivered in a public forum outside of the school, it would have been protected.  Morse, 551 U.S. at 404-05.  Second, when speech fits within the Fraser standard, a court need not do a "substantial disruption" analysis.  "Whatever approach Fraser employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by Tinker."  Id. at 405.

The Supreme Court in Morse also cautioned against over extending Fraser.  Chief Justice Roberts explained that Fraser should not be read to encompass any speech that could fit under some definition of "offensive."

> Petitioners urge us to adopt the broader rule
> that Frederick's speech is proscribable
> because it is plainly "offensive" as that
> term is used in Fraser.  We think this
> stretches Fraser too far; that case should
> not be read to encompass any speech that
> could fit under some definition of
> "offensive." After all, much political and
> religious speech might be perceived as
> offensive to some.

Morse v. Frederick, 551 U.S. 393, 409 (2007) (citations omitted).

The School District relies on the rule articulated by Boroff v. Van Wert City Board of Education, 220 F.3d 465 (6th Cir. 2000).  In Boroff, the United States Court of Appeals for the Sixth Circuit upheld a school ban of "Marilyn Manson" band T-shirts that the school deemed were "contrary to the educational mission of the school."  Id. at 469-71.  The Boroff standard, however, is inconsistent the Third Circuit's decision in Saxe and

with Justice Alito's criticism of such a standard in <u>Morse</u>:

> The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school's "educational mission." This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs. The "educational mission" of the public schools is defined by the elected and appointed public officials with authority over the schools and by the school administrators and faculty. As a result, some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of these groups.

<u>Morse v. Frederick</u>, 551 U.S. 393, 423 (2007) (Alito, J. concurring) (citations omitted).  <u>See also</u> <u>Morse</u>, 551 U.S. at 409 (cautioning against an expansive understanding of the term "offensive" as used in <u>Fraser</u>).[13]

The heart of <u>Fraser</u>'s holding was that a school may

---

[13]     Examples of courts' decisions on what does and does not satisfy the standard of <u>Fraser</u> are the following.   <u>Doninger v. Niehoff</u>, 527 F.3d 41, 49 (2d. Cir. 2008) (calling school administrators "douchebags" and encouraging others "to piss [the principal] off more" satisfy the standard of <u>Fraser</u>); <u>Guiles v. Marineau</u>, 461 F.3d 320, 329 (2d Cir. 2006) (<u>Fraser</u> standard not met for a T-shirt that criticized President George W. Bush); <u>Bragg v. Swanson</u>, 371 F. Supp. 2d 814, 823 (W.D. W.Va. 2005) (<u>Fraser</u> standard not met for a Confederate flag T-shirt); <u>Smith v. Mt. Pleasant Pub. Schs</u>, 285 F. Supp. 2d 987, 989 (E.D. Mich. 2003) (a student calling a teacher "skank," "tramp," discussing two principals having an affair, and questioning the sexuality of an assistant principal satisfy the standard of <u>Fraser</u>); <u>Broussard v. Sch. Bd. of Norfolk</u>, 801 F. Supp. 1526, 1534-36 (D. Va. 1992) (<u>Fraser</u> standard met by T-shirt containing the word "suck").

prohibit speech that is lewd or vulgar. As the United States Court of Appeals for the Third Circuit succinctly put it, "Fraser permits a school to prohibit words that 'offend for the same reasons that obscenity offends[.]'" Saxe, 240 F.3d at 213 (quoting Fraser, 478 U.S. at 685) (additional quotation omitted). The Court concludes that a proper Fraser analysis involves the narrow inquiry as to whether the speech at issue is lewd, vulgar, or otherwise offends for the same reason that obscenity offends. Id.

### b. Standard of Review of a School District's Decision

The determination of what deference, if any, should be given to a school district's determination under Fraser goes to the heart of the tension in First Amendment cases involving public schools. As the Supreme Court has observed, students do not shed their constitutional rights to freedom of speech at the schoolhouse gate. Fraser, 478 U.S. at 680. On the other hand, schools must play a role in protecting children from exposure to "sexually explicit, indecent, or lewd speech." Id. at 684. But school officials do not act in loco parentis for First Amendment purposes. When public schools regulate student speech, they regulate speech as the government, not as parents.[14]

---

[14] As Justice Alito explained,

Although <u>Fraser</u> does not directly address the issue of
review, the Supreme Court has appeared to apply a reasonableness
standard in its decisions in <u>Kuhlmeier</u>, <u>Morse</u>, and <u>Tinker</u>.  In
<u>Kuhlmeier</u>, the Court held that the school district did not
violate the First Amendment by exercising editorial control over
the content of student speech in a school-sponsored publication
"so long as [the school's] actions are reasonably related to
legitimate pedagogical concerns."  <u>Kuhlmeier</u>, 484 U.S. at 273.
Likewise, in <u>Morse</u>, the Supreme Court concluded that a school may

---

> The public schools are invaluable and
> beneficent institutions, but they are,
> after all, organs of the State. When
> public school authorities regulate
> student speech, they act as agents of
> the State; they do not stand in the
> shoes of the students' parents. It is a
> dangerous fiction to pretend that
> parents simply delegate their authority
> — including their authority to determine
> what their children may say and hear —
> to public school authorities. It is even
> more dangerous to assume that such a
> delegation of authority somehow strips
> public school authorities of their
> status as agents of the State. Most
> parents, realistically, have no choice
> but to send their children to a public
> school and little ability to influence
> what occurs in the school. It is
> therefore wrong to treat public school
> officials, for purposes relevant to the
> First Amendment, as if they were
> private, nongovernmental actors standing
> <u>in loco parentis</u>.

<u>Morse</u>, 551 U.S. at 424 (Alito, J. concurring).

restrict student speech at a school event "when that speech is reasonably viewed as promoting illegal drug use." <u>Morse</u>, 551 U.S. at 403. In <u>Tinker</u>, the Court observed that the record did not demonstrate facts which may "reasonably have led school authorities to forecast substantial disruption . . . ." <u>Tinker</u>, 393 U.S. at 514.

The Court concludes that a reasonableness standard properly applies to a school's <u>Fraser</u> determination. A rule of review that would provide no deference to a school's vulgarity determination would maximize the protection of students' First Amendment freedoms, but at the cost of unduly interfering with a school's responsibility to protect students from lewd or vulgar speech. Courts must balance the competing tensions of constitutional freedoms with the role that schools perform in maintaining safe and effective learning environments. This standard is consistent with public school First Amendment case law, and balances the competing interests of school management with the protection of students' constitutional rights. A public school's decision to censor lewd or vulgar speech under <u>Fraser</u> is permissible if the school's determination is an objectively reasonable application of <u>Fraser</u>. A school may not censor speech under <u>Fraser</u> if the speech cannot reasonably be considered lewd or vulgar or if does not "offend for the same reasons that

obscenity offends."  Saxe, 240 F.3d at 213.[15]

### c.  Application of _Fraser_ to these Facts

The next question is whether the ban of the "I ♥
Boobies! (Keep A Breast)" bracelets constitutes an objectively
reasonable exercise of a public school's authority to ban lewd or
vulgar speech under Fraser.  The Court concludes that it does
not.

The justification asserted by the School District in
this litigation is that the word "boobies" is vulgar and
therefore meets the standard of Fraser.  Alternatively, the
District argues that the phrase "I ♥ Boobies!" is vulgar because
it can be viewed as a double entendre.

First, the Court cannot conclude that any use of the
word "boobies" is vulgar and can be banned, no matter what the
context.  The word "boobies" in the context of breast cancer
awareness does refer to a female's breast.  However, the words

_____

[15]    The plaintiffs' status as middle school students may
also be a factor to consider in evaluating the reasonableness of
a school's vulgarity determination.  Cf. Fraser, 478 U.S. at 683
(noting that some members of the audience were only 14 years
old); Kuhlmeier, 484 U.S. at 274-75 (noting that the school
newspaper would presumably be read by some high school students'
younger brothers and sisters).  The Court notes, however, that
the bracelets have been banned at both the middle school and the
high school levels.  (N.T. 161:11-13.)  This fact undercuts the
School District's argument that the ban was enacted in response
to special concerns regarding the maturity of middle school
students.

boob, booby, and bubby have a number of possible meanings, and thus context matters in interpreting the word.  According to the Oxford English Dictionary, the word booby or boobie may refer to "a dull, heavy, stupid fellow: a lubber", a clown, or a nincompoop.  It may also refer to the last boy in a school class, the dunce.  A booby is also a type of seabird.  The word "boob" is defined as a slang word for breasts, but may also be a foolish mistake or blunder.  (<u>See</u> Ex. A to Pls.' Reply.)

These bracelets have also been reported and widely discussed in the media.  Many of these articles contain the phrase "I ♥ Boobies!"  <u>See, e.g.</u>, Peggy Orenstein, <u>Think About Pink</u>, The New York Times Magazine, Nov. 12, 2010, available at http://www.nytimes.com/2010/11/14/magazine/14FOB-wwln-t.html (last visited Mar. 29, 2011) (criticizing "sexy cancer" awareness campaigns but noting that "I get that the irreverence is meant to combat crisis fatigue, the complacency brought on by the annual onslaught of pink . . . .").  The media also uses the word boobies in other contexts, either to refer to female breasts, birds, or nincompoops.[16]

---

[16]    <u>Compare</u> David Bouchier, <u>Out of Order; A Day for the Marginalized Dad</u>, The New York Times, June 15, 2003, available at http://www.nytimes.com/2003/06/15/nyregion /out-of-order-a-day-for-the-marginalized-dad.html (last visited March 29, 2011) (describing television sitcoms as portraying fathers as "incompetent boobies") <u>with</u> Marci Alboher, <u>New Ventures Help Fight the Frustrations of Fighting Breast Cancer</u>, The New York Times, Oct. 25, 2007, available at http://www.nytimes.com/2007/10/25/business/smallbusiness/25sbiz.h

Second, the phrase "I ♥ Boobies!" in the context of these bracelets cannot reasonably be deemed to be vulgar. "I ♥ Boobies!" is presented in the context of a national breast cancer awareness campaign. The phrase "I ♥ Boobies!" is always accompanied by the Foundation's name "Keep A Breast." If the phrase "I ♥ Boobies!" appeared in isolation and not within the context of a legitimate, national breast cancer awareness campaign, the School District would have a much stronger argument that the bracelets fall within <u>Fraser</u>. This is not the case here. One of the bracelets worn by B.H. did not even contain the word "boobies," but rather said "check y♥ur self!! (KEEP A BREAST)." The other bracelets all contained the phrase "Keep A Breast" and all bore the web address of the Keep A Breast Foundation, which provides information on breast cancer prevention and detection.

Nor is the use of the phrase "I ♥ Boobies!" gratuitous. The words were chosen to enhance the effectiveness of the communication to the target audience. There is, of course, no inherent sexual association with the phrase "I ♥ [something]." For example, T-shirts that bear the slogan "I ♥ NY" suggest affinity, not sexual attraction, to New York. The use of the word "boobies" is directed to the target audience of

<hr>

tml (last visited March 29, 2011) (describing efforts to encourage women to conduct breast self-examination).

teenage girls.  The students testified that "boobies" is the word that they use to refer to their breasts.  The phrase is a shorthand way of communicating the importance of breast cancer awareness and of keeping one's breasts healthy.[17]

The School District's argument in this litigation that the bracelets are lewd and vulgar also is undermined by the School District's offering several differing reasons to justify its ban of the bracelets.  The School District's initial justification was that the bracelets had been banned because of student discomfort discussing the human body, inappropriate comments by students, and because some Middle School teachers

---

[17]     The School District has also argued that the bracelet ban is permissible because the School District did not engage in viewpoint discrimination because it recognized Breast Cancer Awareness Day and encouraged its students to wear pink.  For this proposition, the School District cites Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).  Perry addressed whether the First Amendment had been violated when one union with exclusive bargaining power was granted access to a school's internal mail system, while a rival union was denied access.  The Court concluded that the mail system was not a public forum, and the state may draw such distinctions among unions.  Id. at 55. At least one court in this Circuit has concluded that the Third Circuit has not limited Tinker to viewpoint discrimination or analyzed student speech under a forum analysis.  See C.H. v. Bridgeton Bd. of Educ., No. 09-5815, 2010 U.S. Dist. LEXIS 40038, at *20 (D.N.J. Apr. 22, 2010).

But even if a separate category was carved out for viewpoint neutral regulation of student speech, it would not be met here.  The bracelets are part of a campaign to effect a particular healthcare response to the dangers of breast cancer. Young girls are encouraged to perform self examination and to talk openly and without embarrassment about their breasts.  These bracelets represent a much more particularized effort to raise awareness for early detection than wearing pink on a certain day.

were personally offended by the bracelets' "cutesy" treatment of breast cancer awareness. The School's principals testified at their depositions that the word boobies, and even the web address keep-a-breast.org, would be "inappropriate." The School and its counsel later focused their attention on the double entendre of the phrase "I ♥ Boobies!", although Ms. DiVietro continued to emphasize that the bracelet ban reinforces the School's purported discretionary authority to determine what is appropriate and inappropriate for student dress. (Compl. ¶ 29; Answer ¶ 29; N.T. 211:23-212:1, 224:14-226:19, 228:5-10.)

The School itself used the word "boobies" in a prepared statement delivered by a student announcing the bracelet ban. A school would not have been willing to use lewd or vulgar language in a broadcast to its entire student body.[18] This supports a conclusion that the School did not actually consider the word "boobies" to be vulgar. It appears to the Court that the Middle School has used lewdness and vulgarity as a post-hoc justification for its decision to ban the bracelets. Ms. Braxmier testified that banning these bracelets "makes a statement that we as a school district have the right to have

---

[18] The Court notes that in her testimony, Ms. DiVietro freely referred to the word "boobies," but was noticeably unwilling to discuss other hypotheticals in open court. In reference to a hypothetical bracelet addressing testicular cancer, Ms. DiVietro became uncomfortable and explained "I don't know if I can say the word that, you know . . . ." (N.T. 225:2-24.)

discretionary decisions on what types of things are appropriate and inappropriate for our school children." (N.T. 228:5-10.)

A court may also take into consideration that a school's decision to ban speech was based on an erroneous understanding of the law. See Guiles, 461 F.3d at 327 (faulting lower court for accepting the school district's judgement that a T-shirt was inappropriate and misjudging the scope of Fraser). Public schools do not have the broad authority to make "discretionary decisions on what types of things are appropriate and inappropriate . . . ." (N.T. 228:5-10.) If this were the case, public schools would have the authority to ban both Tinker's arm band as well as Cohen's jacket.

The delay in both enacting the ban and announcing the ban also undermines the School District's argument that the bracelets are lewd and vulgar. The record shows that the bracelets became popular among students at the beginning of the 2010-2011 school year, which began August 30, 2010. After the two plaintiffs wore the bracelets every day until mid- to late-September, the School took no action. The ban was never communicated directly from the administration to the students until October 27, 2010, which is approximately two months after students began wearing the bracelets to school. In contrast, after Matthew Fraser delivered his speech, "students appeared to be bewildered and embarrassed by the speech" and the next day one

34

teacher "found it necessary to forgo a portion of the scheduled class lesson in order to discuss the speech with the class." Fraser, 478 U.S. at 678.

For all of these reasons, the Court concludes that it would have been unreasonable for these school officials to conclude that these breast cancer awareness bracelets are lewd or vulgar under the Fraser standard. Even in a middle school, these bracelets do not "offend for the same reasons that obscenity offends." Saxe, 240 F.3d at 213.

### 2. *Tinker* Analysis

Having concluded that the bracelets cannot be banned under Fraser, the Court must consider whether this speech is proscribable under the Tinker "substantial disruption" analysis. "[I]f a school can point to a well-founded expectation of disruption — especially one based on past incidents arising out of similar speech — the restriction may pass constitutional muster." Saxe, 240 F.3d at 212. "As subsequent federal cases have made clear, Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." Id. at 211.

Cases that have applied Tinker have consistently noted that a general fear of disruption does not constitute the type of necessary disruption. See Sypniewski v. Warren Hills Req'l Bd.

of Educ., 307 F.3d 243, 255-58 (3d Cir. 2002) (concluding that the district's ban on the Jeff Foxworthy T-shirt was unconstitutional because there was no substantial disruption); C.H. v. Bridgeton Bd. of Educ., No. 09-5815, 2010 U.S. Dist. LEXIS 40038, at *26 (D.N.J. Apr. 22, 2010) (finding no substantial disruption where school district only articulated "a general fear of disruption" where student wore an anti-abortion armband); DePinto v. Bayonne Bd. of Educ., 514 F. Supp. 2d 633, 646 (D.N.J. 2007) (finding no "specific and significant fear" of disruption where fifth grade students wore buttons to school depicting the Hitler youth to protest the school's dress code); Killion v. Franklin Reg'l Sch. Dist., 136 F. Supp. 2d 446, 456 (W.D. Pa. 2001) (concluding that evidence of upset school employees did not constitute a substantial disruption); Nuxoll v. India Prairie Sch. Dist. #204, 523 F.3d 668, 674 (7th Cir. 2008) (noting that symptoms of substantial disruption are akin to symptoms of a "sick school").

There is no evidence before the Court of any incidents that caused the type of disruption required by Tinker. Notably, there were no incidents presented to the Court of any disruption prior to the School's bracelet ban. In mid- to late-September, a handful of teachers of the 120 teachers approached the administration to seek guidance regarding the School's policy towards the bracelets. At this point, the bracelets had been on

campus for at least two weeks without any evidence of disruption. Despite any incidents that would suggest a problem, the School banned the bracelets without any official announcement. At the time of the ban, the School had at most a general fear of disruption.

After the ban was enacted, two incidents took place that are related to the bracelets. During Ms. Braxmeier's October 28, 2010 conversation with a student about her "I ♥ Boobies! (Keep A Breast)" bracelets, the student stated that she believed one or possibly more boys had made remarks to girls about their "boobies" in relation to the bracelets. Second, on or about November 16, 2010, the Middle School administrators received a report that two female students were discussing the bracelets at lunch. A boy sitting with them interrupted and made statements such as "I want boobies" while making inappropriate gestures with two spherical candies. The boy admitted to the incident, and he was suspended for a day. (Braxmeier Dep. 14:24-15:3, 16:9-17:5.)

Even ignoring the lack of justification for the initial ban under Tinker, the two events in October and November fail to create a "substantial disruption." Such isolated incidents are well within a school's ability to maintain discipline and order and they did not cause a disruption to the School's learning environment. Accordingly, the Court concludes that the School's

ban of these bracelets was not justified under Tinker.

The Court, therefore, concludes that the plaintiffs have demonstrated a reasonable likelihood of success on the merits that the School District violated their First Amendment rights.

B.     Irreparable Harm

The second requirement for a preliminary injunction is a showing that the plaintiff will suffer irreparable harm if an injunction is not issued.  It is well-established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976).  In this case, the plaintiffs have been directly penalized by the suspensions as well as by the ongoing restraint of the freedom to wear these breast cancer awareness bracelets.

C.     Balance of Harm and Public Interest

The remaining two factors, balance of harm and public interest, also favor the plaintiffs.  The Court first considers "whether granting preliminary relief will result in even greater harm to the nonmoving party."  Allegheny Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999).  The Court is satisfied that the continued denial of the plaintiffs' First Amendment rights

outweighs any harm the School District may suffer by suspending
this ban pending the final outcome of this litigation.  The
School has expressed concern that if the ban is lifted, then
students will try to test the permissible boundaries with other
clothing.  Nothing in this decision prevents a school from making
a case by case determination that some speech is lewd and vulgar
while other speech is not.  It should be clear, however, that a
school must consider the contours of the First Amendment before
it decides to censor student speech.

Likewise, the public's interest favors the protection
of constitutional rights in the absence of legitimate
countervailing concerns.  See <u>Council of Alternative Political
Parties v. Hooks</u>, 121 F.3d 876, 884 (3d Cir. 1997).

IV.  <u>Conclusion</u>

The Court concludes that the plaintiffs have satisfied
their burden and are entitled to a preliminary injunction to
enjoin the Middle School from enforcing its prohibition of the
breast cancer awareness bracelets at issue in this case.   As
this is a non-commercial case involving a relatively small amount
of money, and the balance of hardships favors the plaintiffs, the
Court waives the Rule 65(c) security bond requirement.  <u>Elliot v.
Kiesewetter</u>, 98 F.3d 47, 59-60 (3d Cir. 1996).

An appropriate Order shall issue separately.